# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Franklin County, | : |
| | : |
| Petitioner | : |
| | : |
| v. | : No. 134 C.D. 2015 |
| | : Submitted: August 14, 2015 |
| Unemployment Compensation | : |
| Board of Review, | : |
| | : |
| Respondent | : |


BEFORE:   HONORABLE BONNIE BRIGANCE LEADBETTER, Judge[1]
          HONORABLE ROBERT SIMPSON, Judge
          HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION BY**
**SENIOR JUDGE COLINS**[2]                    **FILED:  May 13, 2016**

Franklin County (Employer) petitions for review of the January 9, 2015 order of the Unemployment Compensation Board of Review (Board) concluding that Bruce Puchalski (Claimant) was not ineligible for unemployment compensation benefits under Section 402(e) of the Unemployment Compensation Law[3] (Law) due to willful misconduct because Claimant demonstrated good cause for his violation of Employer's policy.  We affirm.

---

[1] This case was submitted on or before January 31, 2016, when Judge Leadbetter assumed the status of senior judge.

[2] This opinion was reassigned to the opinion writer on March 15, 2016.

[3] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e). Section 402(e) of the Law provides that an employee shall be ineligible for compensation for any week in which his or her unemployment is due to discharge for willful misconduct connected to his or her work.  43 P.S. § 802(e).

Claimant filed an initial internet claim for unemployment compensation on July 10, 2014 and stated on the accompanying separation questionnaire that he was discharged for violating Employer's rule against personal contact. (R. Item 2, Initial Internet Claim.) Employer submitted separation information to the Department of Labor and Industry (Department), including a letter addressed to Claimant in which Employer described the incident leading to Claimant's discharge, its investigation of that incident, and the rules or policies Claimant's conduct allegedly violated. (R. Item 3, Employer Separation Information.) On July 31, 2014, the Department conducted an oral interview with Claimant in order to provide Claimant the opportunity to rebut Employer's assertion that Claimant violated its policy regarding an employee's behavior towards inmates and members of the public. (R. Item 5, Record of Oral Interview.) On August 1, 2014, the Department issued a Notice of Determination finding that Employer had met its burden under the Law and Claimant was ineligible for unemployment benefits due to willful misconduct. (R. Item 6, Notice of Determination.) Claimant appealed the Department's determination to the Referee. (R. Item 7, Claimant's Petition for Appeal.) Claimant also requested and received a subpoena for a copy of the surveillance video documenting the incident for which Claimant's employment was terminated and for a copy of Claimant's personnel file. (R. Item 10, Correspondence; R. Item 12, Subpoena.)

A hearing was held before the Referee on September 29, 2014. (R. Item 13, Hearing Transcript (H.T.).) Claimant, represented by counsel, testified on his own behalf. (R. Item 13, H.T. at 1.) Employer presented the testimony of: Lieutenant Greg Snodgrass, Carrie Aaron (regarding Claimant's employment

2

history), and Warden Dan Keen.[4] (*Id*. at 1-2.) Prior to receiving testimony, the Referee entered documents previously submitted to and generated by the Department into the record without objection. (*Id*. at 5.) At this time, Claimant raised the fact that Employer failed to provide Claimant a copy of the subpoenaed video surveillance and Claimant's personnel file prior to the hearing. (*Id*.) Employer informed the Referee that it had brought both the surveillance video and Claimant's personnel file to the hearing in compliance with the subpoena, which specified that Employer was to bring the requested material to the hearing but did not specifically require Employer to provide the material to Claimant prior to the hearing. (*Id*.; R. Item 12, Subpoena.) At the close of the hearing, Claimant requested that Employer be prohibited from arguing that Claimant wasn't threatened because the surveillance video was not produced prior to or at the hearing in response to Claimant's request and Claimant was denied the opportunity to offer it as proof that Claimant was threatened. (R. Item 13, H.T. at 29-30.) The Referee stated that Employer "has not entered it into the record at this time, there's been no testimony to the video so I need to make it from the credibility of the circumstances," and closed the record. (*Id*. at 30.) On October 27, 2014, the Referee issued a decision and order finding Claimant ineligible to receive unemployment compensation due to willful misconduct. (R. Item 14, Referee's Decision and Order.) Claimant petitioned the Board for review of the Referee's decision and order. (R. Item 15, Claimant's Petition for Review.)

---

[4] Captain James Sullen and Charles Martin, Employer's Human Resources representative, also appeared at the hearing to offer testimony for Employer but Employer determined that their testimony would be repetitive and chose not to offer it into the record. (R. Item 13, H.T. at 2, 22.)

On January 9, 2015, the Board issued a decision and order reversing the Referee and concluding that Claimant was not disqualified from receiving unemployment compensation benefits due to conduct amounting to willful misconduct under the Law. In its decision, the Board made the following findings of fact:

1. [Claimant] was last employed as a full-time corrections officer by [Employer] from mid-summer of 2012, at a final rate of $14.37 an hour and his last day of work was July 10, 2014.

2. [Employer] has Standard of Conduct Policy, of which [Claimant] was aware, that requires employees to be courteous and discrete to members of the public, inmates and staff and to maintain proper decorum and command of temper and avoid the use of offensive, insolent, profane or obscene language.

3. On June 23, 2014, [Claimant] noticed a visitor using a key to scratch the window sill.

4. The visitor scratching the window sill was male and sixteen years of age.

5. The minor visitor was visiting his mother, who was an inmate.

6. [Claimant] removed the minor visitor from the visitation area.

7. The minor visitor "squared up" to throw a punch at [Claimant] several times.

8. The minor visitor informed the [Claimant] that he was going to "kick his a *s."

9. As [Claimant] was escorting the minor visitor, the minor visitor threatened to kill [Claimant] in the parking lot.

4

10. [Employer's] lieutenant was summoned to the lobby by [Claimant].

11. [Employer's] lieutenant went upstairs to the visitation area with the minor visitor's guardian, and [Claimant] was left behind.

12. The minor visitor was outside the building.

13. When the lieutenant came back from upstairs with the guardian, the minor visitor came back into the lobby, but was escorted out by the guardian.

14. While inside the lobby, the minor visitor requested [Claimant] come out to the parking lot.

15. While upstairs, the guardian stated that [Claimant] touched the minor visitor's arm.

16. The minor visitor came back into the lobby.

17. The guardian and [Claimant] argued about what transpired.

18. The guardian told [Claimant] that he touched the minor visitor's arm.

19. [Claimant] denied touching the minor's visitor's arm.

20. [Claimant] told the guardian that he "should have dropped [his] son" when he threatened him.

21. The lieutenant told [Claimant] that it was enough.

22. [Claimant] was discharged for making threatening comments to the guardian about the minor visitor, in violation of the [Employer's] policy.

(R. Item 19, Board Findings of Fact (F.F.) ¶¶1-22.) Based on its findings, the Board concluded that "even though [Claimant] admitted to making the remark,

5

[Claimant] credibly established that he was not the instigator of the confrontation. Although the Board does not condone [Claimant] making the remark, the Board is compelled to find that [Claimant] was provoked by the minor visitor and his guardian. Accordingly, [Claimant] has provided adequate justification for his actions." (*Id*., Discussion at 3.) Employer petitioned this Court for review of the Board's order.[5]

In order to meet its burden to show that a claimant has committed willful misconduct by violating a work rule or policy, an employer must demonstrate the existence of the rule and the fact of the claimant's violation. Section 402(e) of the Law, 43 P.S. § 802(e); *Chapman v. Unemployment Compensation Board of Review*, 20 A.3d 603, 607 (Pa. Cmwlth. 2011). There is no dispute that Employer did so in the instant matter. Employer's standard of conduct requires its employees to be "courteous and discrete to members of the public, inmates and staff and to maintain proper decorum and command of temper and avoid the use of offensive, insolent, profane, or obscene language." (R. Item 3, Employer Separation Information, Employer Standards of Conduct ¶L(m).) Claimant violated Employer's standard of conduct by telling the guardian of a minor visitor that Claimant "should have dropped," the guardian's son when the minor threatened Claimant. (R. Item 19, F.F. ¶18.)

If an employer has met its burden by demonstrating the existence of a work rule or policy and the fact of the claimant's violation, the burden shifts to the claimant to demonstrate the existence of good cause for the violation of employer's

---

[5] In an unemployment compensation appeal, this Court's scope of review is limited to determining whether an error of law was committed, whether constitutional rights were violated, or whether necessary findings of facts are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704; *On Line Inc. v. Unemployment Compensation Board of Review*, 941 A.2d 786, 788 n.7 (Pa. Cmwlth. 2008).

work rule. *Chapman*, 20 A.3d at 607. The question of whether a claimant has demonstrated good cause—that the claimant's actions were justified or reasonable under the circumstances—is a question of law subject to this Court's plenary review. *Rossi v. Unemployment Compensation Board of Review*, 676 A.2d 194, 198 (Pa. 1996). In order to determine whether a claimant has met his or her burden by demonstrating good cause, we must examine the claimant's reason for noncompliance in light of the totality of the circumstances surrounding the claimant's violation of employer's work rule. *Bell Socialization Services, Inc. v. Unemployment Compensation Board of Review*, 74 A.3d 1146, 1148 (Pa. Cmwlth. 2013). If a claimant has established good cause, the claimant will remain eligible for unemployment compensation despite violating employer's work rule because the conduct for which claimant was discharged from employment does not amount to willful misconduct under the Law. *Frumento v. Unemployment Compensation Board of Review*, 351 A.2d 631, 634 (Pa. 1976).

Before this Court, Employer argues that Claimant did not have good cause for violating its standards of conduct and that the Board's findings of fact are not supported by substantial evidence. Employer also contends that the Board capriciously disregarded the Referee's findings, focusing on the Referee's finding that Claimant failed to remove himself from the situation to regain his composure. (R. Item 14, Referee's Decision and Order, F.F. ¶13.)

Addressing Employer's last argument first, we conclude that substantial evidence supports the Board's findings and the Board did not capriciously disregard evidence when it made findings distinct from the Referee. The Board is the ultimate finder of fact, empowered to determine credibility, and weigh and resolve conflicts in the evidence. *Peak v. Unemployment Compensation*

*Board of Review*, 501 A.2d 1383, 1388 (Pa. 1985). However, the Board may not "deliberately disregard[] competent evidence that a person of ordinary intelligence could not conceivably have avoided in reaching a particular result." *Henderson v. Unemployment Compensation Board of Review*, 77 A.3d 699, 711 n.5 (Pa. Cmwlth. 2013).

In the instant matter, the Board made several findings concerning the minor visitor's behavior, including: "[t]he minor visitor 'squared up' to throw a punch at [Claimant] several times" and "[t]he minor visitor informed the claimant that he was going to "kick his a *s." (R. Item 19, F.F. ¶¶7-9.) The Referee's decision did not include similar findings. (*See* R. Item 14, Referee's Decision and Order.) However, the Referee's failure to make findings concerning the minor visitor's conduct towards Claimant is not the same as a lack of evidence in the record concerning the minor visitor's conduct. Rather, each of the Board's findings concerning the minor visitor's conduct is supported by Claimant's testimony and the contemporaneous report Claimant submitted at the time of the incident. (R. Item 13, H.T. at 10, 23 & Ex. E1.) Similarly, Employer repeatedly stresses the fact that the visitor was a minor and contends that the Board failed to weigh this fact in evaluating whether or not Claimant's actions were provoked. Yet, it is clear from both Lieutenant Snodgrass' testimony and Claimant's testimony that the age of the visitor was discovered only after the visitor had threatened Claimant and been escorted out of the building.[6] (*Id*., H.T. at 11, 22-23; *see also* R. Item 14, Referee's F.F. ¶5 ("[Claimant] discovered a male, who it was later discovered was a juvenile[,] was damaging caulking around the visitation

---

[6] Claimant testified that "[w]hen I first met the individual he was sitting down. I could see facial hair….Once he stood up I would say he was maybe about five seven, five eight. He was shorter than me." (R. Item 13, H.T. at 22-23.)

8

window.").)  Regardless, the provocation that led to Claimant's violation of Employer's work rule was not simply the minor's behavior, but included the guardian's accusation that Claimant had grabbed the minor visitor, which was uttered after the minor visitor had been led out of the building by his guardian and the guardian returned to confront Claimant.  (R. Item 19, F.F. ¶¶17-21; R. Item 13, H.T. at 16, 23.)

Employer also argues that the Referee's findings that Claimant "did not advise his supervisor that he had been threatened or felt he was in danger," and "did not leave the area to avoid the situation," should be determinative of whether Claimant had good cause for his violation of the standards of conduct and are facts that were deliberately disregarded by the Board.  (R. Item 14, Referee's F.F. ¶¶10, 13.)  However, this is not an instance of the Board capriciously disregarding evidence; instead, the Board simply weighed the evidence differently than the Referee and it is the Board rather than the Referee that is the ultimate finder of fact.

Claimant testified that he believed summoning assistance to the visiting room while the minor visitor was threatening and arguing with him would escalate the situation and that "until he got calmed down I really didn't have an opportunity to pull out my radio and call for help without making the situation even worse," which was Claimant's explanation for why, as he was walking the minor visitor down to the lobby, he requested that Lieutenant Snodgrass meet them there instead of calling for assistance in the visitor's room.  (R. Item 13, H.T. at 24.)  Both Claimant and Lieutenant Snodgrass testified that when they met in the lobby, Claimant asked for the police to be called and Lieutenant Snodgrass overruled him.  (R. Item 13, H.T. at 16, 24.)  Similarly, the testimony of both

9

Lieutenant Snodgrass and Claimant casts doubt on Employer's argument and the Referee's finding that Claimant should have left the area to avoid the situation. Prior to Claimant's untoward statement to the guardian, the minor visitor had been escorted out of the building, Lieutenant Snodgrass went with the guardian to the visiting room to hear the guardian's version of events, and Claimant was waiting to give his report to Lieutenant Snodgrass. (R. Item 13, H.T. at 9-12, 15-16, 23, 25, 27-28.) Lieutenant Snodgrass specifically testified:

> When I got there [Claimant] started explaining to me what had happened, and the father was coming off of the elevator. And I walked upstairs with the father to try—or it wasn't the father, he was the guardian, but he referred to him as his son. And I went with him **and I asked [Claimant] to stay in the lobby** while I talked to him because I was, there was obviously a lot of tension between them and I was trying to figure out what had happened since I came in new on it. I went up with him; he explained to me what had happened upstairs. Then we came downstairs and walked out [and] the boy came walking back into the lobby. The guardian went directly to the boy and took him straight out front, and then came back in and that's when this conversation went on.

(*Id*. at 9-10 (emphasis added).) It was only after Lieutenant Snodgrass returned to the lobby with the guardian, the minor visitor attempted to reenter the building and was escorted out by the guardian, and the guardian returned to confront Claimant as he was reporting to Lieutenant Snodgrass that the situation escalated and Claimant violated Employer's work rule. (*Id*.) These events transpired quickly and are open to multiple interpretations. The Referee determined that Claimant's failure to leave the lobby escalated the situation. The Board did not place equal weight on this fact. Moreover, the testimony from Employer's witness shows that Claimant had reason to believe he was directed to wait in the lobby in order to

10

report to his superior his version of the events that had transpired. Regardless of how Employer, Claimant, the Referee, or this Court would weigh the evidence and which narrative each would endorse, it is the Board that determines the weight afforded the evidence and who is charged with the duty of being the final factual arbiter. In the instant matter, the Board did not capriciously disregard evidence; instead, the Board weighed the evidence, resolved conflicts within the evidence, and determined the credibility of the witnesses before it. The Board's findings are supported by substantial, competent evidence and they are binding on appeal.

The question of whether a claimant is eligible to receive unemployment compensation benefits is legally distinct from whether an employer was justified in discharging one of its employees. The propriety of an employer's personnel decision is beyond the scope of the Board and this Court when determining eligibility for benefits under the Law. Instead, our focus is on whether the circumstances surrounding the employee's discharge are such that when the employee files a claim for unemployment benefits that employee's conduct prohibits the employee from being eligible for benefits under the Law.

In *Department of Corrections v. Unemployment Compensation Board of Review*, 943 A.2d 1011 (Pa. Cmwlth. 2008), this Court held that when determining whether a claimant has good cause for violating a work rule, a corrections officer cannot be held to a higher standard of conduct based upon the nature of the employment involved. *Id.* at 1015; *see also Grieb v. Unemployment Compensation Board of Review,* 827 A.2d 422, 427 (Pa. 2003) (declining to graft a public safety exception upon the good cause analysis required under Section 402(e) of the Law); *Navickas v. Unemployment Compensation Review Board*, 787 A.2d 284, 288 (Pa. 2001) (rejecting the application of a higher standard of care for

11

health care workers in a determination of whether a claimant's conduct amounts to willful misconduct under the Law). To determine whether the proscribed use of language amounts to willful misconduct or whether the claimant had good cause, we examine the context in which the language was used, including whether the use of abusive language was *de minimis* or provoked. *Brown v. Unemployment Compensation Board of Review*, 49 A.3d 933, 937 (Pa. Cmwlth. 2012); *Cundiff v. Unemployment Compensation Board of Review*, 489 A.2d 948, 951 (Pa. Cmwlth. 1985). If a claimant has demonstrated that the use of profanity or offensive language was provoked by the situation or the person to whom the claimant has addressed the proscribed language, the claimant will have carried his or her burden to show that good cause existed despite the claimant's violation of a work rule. *Brown*, 49 A.3d at 937; *Cundiff*, 489 A.2d at 951.

This Court concluded that a claimant had good cause for warning his superior that future physical contact would be met in kind after the supervisor slapped the claimant's hand away while the claimant was gesturing during an argument. *First Family Federal Savings and Loan Association v. Unemployment Compensation Board of Review*, 449 A.2d 870, 872 (Pa. Cmwlth. 1982). We reasoned that "the remark, nurtured in the heat of the argument, was clearly conditional (i.e. [claimant] threatened to retaliate *only if* his physical integrity were violated once more [footnote omitted]), and there was no indication whatsoever that the [claimant] had any intent to act in accordance with the remark." *Id*. at 873 (emphasis in original). In *Arnold v. Unemployment Compensation Board of Review*, 703 A.2d 582 (Pa. Cmwlth. 1997), this Court concluded that the claimant had good cause for referring to a customer in a profane manner because the claimant was instinctively responding to almost being hit by the customer's car.

12

*Id*. at 584. We also concluded that the claimant had good cause in *Miller v. Unemployment Compensation Board of Review*, 83 A.3d 484 (Pa. Cmwlth. 2015), overruling the Board, which had concluded that the claimant should have retreated after a coworker had grabbed the claimant, threatened him, and pushed the claimant into a tool cart. *Id*. at 488. In response to the coworker's conduct in *Miller*, the claimant pushed back; we concluded that the claimant's use of physical contact was "instantaneous and reflexive," and that the claimant had a right to protect himself against his coworker's physical assault. *Id*.; *see also Perez v. Unemployment Compensation Board of Review*, 736 A.2d 737 (Pa. Cmwlth. 1999) (concluding that the claimant had good cause for pushing of coworker because supervisor had deliberately set out to have coworker provoke claimant's actions).

Employer argues that Claimant was the instigator and that his comment was not instantaneous and reflexive. Employer contends that Claimant made a physical threat to a minor after his supervisor had intervened, after the minor visitor had been removed from the building, and after any threat had dissipated and Claimant should have removed himself from the situation. However, Employer's argument disregards the Board's credibility findings and is contradicted by its own witness' testimony.

Claimant's unprofessional remark came only after the guardian reentered the building, reigniting the situation. Claimant's response was instantaneous and, unlike the claimant in *First Family*, it was not conditional; Claimant's use of the past tense and repeated denial of lesser physical conduct in the heat of the moment belied any intent to turn his words into actions. Claimant was being impugned and he reacted much like the Claimant in *Arnold* reacted. Notably absence from the record before the Board was any evidence disproving

13

Claimant's version of events. Employer did not submit the subpoenaed surveillance video, did not present the testimony of the minor visitor and his guardian, and did not present or submit testimony from two witnesses who had been in the visiting room at the time the events began. (R. Item 13, H.T. at 18, Ex. E-1.) Moreover, Lieutenant Snodgrass testified that he instructed Claimant to remain in the lobby, creating a barrier to Claimant's ability to remove himself from the situation as Employer argues he should have done. The record, taken as a whole, supports the Board's conclusion that Claimant's inappropriate language was the culmination of repeated provocations by the minor visitor and his guardian. While, like the Board, we do not condone Claimant's conduct, our holding does not rest upon whether Claimant should have been terminated from employment for his conduct, for it is Employer alone that makes that determination. Rather, our holding rests solely upon the question of whether Claimant's conduct amounted to willful misconduct and like the Board, we must conclude that it does not.

Accordingly, the order of the Board is affirmed.


_____
**JAMES GARDNER COLINS, Senior Judge**

14

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Franklin County, :
:
                    Petitioner :
:
              v. : No. 134 C.D. 2015
:
Unemployment Compensation :
Board of Review, :
:
                    Respondent :

# **O R D E R**

AND NOW this 13th day of May, 2016, the order of the Unemployment Compensation Board of Review in the above-captioned matter is AFFIRMED.

_____
**JAMES GARDNER COLINS, Senior Judge**

Franklin County, :
            Petitioner : 

v. : No. 134 C.D. 2015
           : SUBMITTED: August 14, 2015

Unemployment Compensation :
Board of Review, :
            Respondent :

BEFORE:    **HONORABLE BONNIE BRIGANCE LEADBETTER,** Judge
                **HONORABLE ROBERT SIMPSON,** Judge
                **HONORABLE JAMES GARDNER COLINS,** Senior Judge

**OPINION NOT REPORTED**

**DISSENTING OPINION BY**
**JUDGE LEADBETTER**             **FILED:   May 13, 2016**

      I must respectfully dissent. I agree with Employer and the referee. Unlike the cases relied upon by the majority, such as *Arnold* and *Miller*, where the claimants' actions were instinctive and reactive to the provoking stimulus, any perceived threat to Puchalski had been removed and he was speaking with Visitor's guardian. I believe that Puchalski's conduct deviated from that which Employer can reasonably expect from a corrections officer. The difficulty in maintaining order in a prison would be exacerbated if corrections officers threatened physical retaliation at every perceived provocation. Puchalski's apparent inability to control himself when confronted by a sixteen-year-old clearly calls into question his ability to act appropriately when dealing with inmates.

Employer has a standard of conduct policy, of which Puchalski was aware and with which he was expected to comply, that requires employees to be courteous and discreet to members of the public, inmates and staff and to maintain proper decorum and command of temper and avoid the use of offensive, insolent, profane or obscene language. I must conclude that the record establishes that Puchalski violated that policy and that he did not establish good cause for his violation. *See Dep't of Corr. v. Unemployment Comp. Bd. of Review*, 943 A.2d 1011, 1017 (Pa. Cmwlth. 2008) (decision based on claimant's failure to prove good cause rather than a higher standard of conduct for corrections officers).

Accordingly, I would reverse the order of the Board.

_____
**BONNIE BRIGANCE LEADBETTER,**
Judge